UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ROBERT E. ALLEN, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> JERRY BROWN, *et al.*, <br><br> Defendants. | Civil Action No. 17-1951 (ESH) |

## MEMORANDUM OPINION

Plaintiffs, twenty-three federal police officers stationed at the Veterans Affairs ("VA") Medical Center in Washington, D.C., bring this action against the Chief of Police at the VA Medical Center, Jerry Brown, and the VA Medical Center Director, Brian Hawkins. They allege that defendants secretly installed audio and video recording devices at several non-public locations within the VA Medical Center, in violation of the federal wiretapping statute and the Fourth Amendment. Before the Court is defendants' renewed motion for summary judgment. For the reasons stated herein, the Court will grant that motion.

## BACKGROUND

I.  **FACTS**[1]

Unless otherwise stated, the following facts are not in dispute. On October 23, 2013, Brown sought and was granted authorization from Hawkins and the VA Medical Center Associate Director to install covert surveillance cameras in two rooms used by the police force

---

[1] The allegations in the complaint and the history of this case are set forth more extensively in the Court's opinion in *Allen v. Brown*, 320 F. Supp. 3d 16 (D.D.C. 2018).

under his command: the Control Room and the Report Writing Room. (Defs.' Statement of Facts ¶¶ 1–2, ECF No. 32 ("Defs.' Facts").) In his request for authorization, Brown stated that he sought installation of the devices to investigate what he had observed as "suspicious activity" that "may be illegal" in both rooms. (Defs.' Ex. A ¶¶ 1–2, ECF No. 10-1.)

The Control Room is a workspace with no windows, where the 911 system and closed circuit monitors are located, and where all alarms are routed—essentially "a first response area, where [officers] answer phones and things of that nature." (Pls.' Ex. 14, at 43:25–44:12, ECF No. 32-15 ("Thompson Dep.").) According to plaintiffs, "the Control Room is also a place for social interaction where officers meet to engage in conversation." (Pls.' Opp. to Defs.' Renewed Mot. for Summ. J. at 27, ECF No. 35 ("Pls.' Opp.").) The Report Writing Room is used by officers to write reports; to "conduct police interviews, interrogations, online training, [and] processing;" to temporarily store evidence; and to eat lunch. (Defs.' Ex. B at 1, ECF No. 10-2.) Neither room was open to the public, but both rooms were accessible to all officers at all times, for all officers had keys to each room. (Defs.' Ex. J ¶ 5, ECF No. 10-10 ("Brown Decl.").) Plaintiffs further describe both rooms as places where "individuals . . . could stop talking when other individuals entered the rooms," where "doors could be closed to prevent individuals from outside the office from overhearing conversations," and where officers could "vent and criticize their employers."[2] (Pls.' Opp. at 7, 21.)

In November 2013, Johnson Controls, Inc., installed a camera in each room. (Defs.' Facts ¶¶ 4, 15; Defs.' Ex. Q ¶ 4, ECF No. 32-1 ("Johnston Decl.").) Although the cameras were capable of recording audio, the representatives from Johnson Controls did not connect the audio

---

[2] Plaintiffs do not cite to any evidence in the record to support this assertion, but the Court has included it in an effort to present the evidence in the light most favorable to the plaintiffs.

wires on either camera and programmed the settings on the digital video recorder ("DVR") so that the feedback from the cameras did not include audio. (Johnston Decl. ¶¶ 6–7.) The parties dispute whether the settings were later changed to record audio. (Defs.' Facts ¶ 14; Pls.' Resp. to Defs.' Statement of Undisputed Material Facts ¶ 16, ECF No. 35-1 ("Pls.' Facts").) The parties also dispute whether a third camera was installed in the Watch Commander's Office, which plaintiffs claim is used by at least one female officer as a changing area. (Pls.' Facts ¶¶ 17–18.)

In January 2014, officers discovered the hidden camera and microphone in the Control Room. (*See, e.g.*, Pls.' Ex. 1 ¶ 3, ECF No. 35-2 ("Rego Decl."); Pls.' Ex. 3 ¶ 3, ECF No. 35-4 ("Jeter Decl."); Pls.' Ex. 4 ¶ 3, ECF No. 35-5 ("Holder Decl.").) An LED light attached to the unit indicated that it was operating when it was discovered. (*See, e.g.*, Rego Decl. ¶¶ 5–6; Jeter Decl. ¶ 4; Holder Decl. ¶ 4.) It was removed soon thereafter, although by whom is unknown. (Defs.' Facts ¶ 6; Pls.' Facts ¶ 6.) According to defendants, the camera in the Report Writing Room was never discovered and was shut down on March 23, 2014. (Defs.' Facts ¶ 7.) Plaintiffs maintain, though, that this camera was still operating when it was discovered by plaintiff Thomas Rego on December 31, 2014, and that it remained in place and operational until either August 2015 (Pls.' Facts ¶ 7) or March 2016. (Pls.' Opp. at 2.)

## II. PROCEDURAL HISTORY

On June 22, 2015, twenty-four VA Medical Center police officers brought suit against Brown, Hawkins, and the Secretary of the VA, claiming that their use of the covert recording devices in the Control Room, the Report Writing Room, and the Watch Commander's Office violated federal and state law (the "2015 Litigation"). (*See* Compl., *Allen v. Brown*, No. 15-cv-0969 (D.D.C. June 22, 2015), ECF No. 1.) Defendants' motion to dismiss was granted in part and denied in part, *Allen v. Brown*, 185 F. Supp. 3d 1, 3 (D.D.C. 2016), but then, before

3

discovery could be completed, plaintiffs' counsel withdrew, and the case was dismissed without prejudice for failure to prosecute. (Order, *Allen v. Brown*, No. 15-cv-0969 (Sept. 17, 2016), ECF No. 42.)

Almost two years after that dismissal, on September 22, 2017, twenty-three VA Medical Center officers—including 21 from the 2015 Litigation—initiated the current action. (*See* Compl., ECF No. 1.) The complaint named the same defendants and included the same four counts as the 2015 Litigation. The complaint alleged that: Brown and Hawkins violated the federal wiretapping statute, *see* 18 U.S.C. §§ 2510, *et seq.* (Count 1); Brown and Hawkins violated the District of Columbia wiretapping statute, *see* D.C. Code §§ 23-542, *et seq.* (Count 2); Brown and Hawkins engaged in an unlawful civil conspiracy, in violation of D.C. law, to violate federal and state wiretapping statutes (Count 3); and Brown violated plaintiffs' Fourth Amendment right to be free from unreasonable searches and seizures (Count 4). (*See* Am. Compl. ¶¶ 59–78, ECF No. 5.)

On January 17, 2018, defendants filed a motion to dismiss or, in the alternative, for summary judgment, which the Court granted in part and denied in part. *See Allen v. Brown*, 320 F. Supp. 3d 16 (D.D.C. 2018). The Court dismissed without prejudice Counts 2 and 3, which had been converted into Federal Tort Claims Act ("FTCA") claims against the United States, for failure to comply with the FTCA's exhaustion requirement. *Id.* at 34. The Court also dismissed the Secretary of the VA from the suit, as he was not named as a defendant in any count. *Id.* at 42. The Court allowed Counts 1 and 4 to proceed to discovery. *Id.*

After the parties completed discovery,[3] defendants renewed their motion for summary

---

[3] Although the Court initially ordered only limited discovery, *Allen*, 320 F. Supp. 3d at 42, in the end, both sides completed all discovery. (Order, ECF No. 31.)

4

judgment on August 8, 2019. (*See* Defs.' Renewed Mot. for Summ. J., ECF No. 32 ("Defs.' Mot.").) Plaintiffs filed an opposition on September 13, 2019, and defendants filed a reply on September 27, 2019. (*See* Pls.' Opp.; Defs.' Reply, ECF No. 36.)[4]

## ANALYSIS

### I. LEGAL STANDARD

A court will grant summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if a dispute over it might affect the outcome of the suit under governing law," and "a dispute is 'genuine' if the evidence is such that 'a reasonable jury could return a verdict for the nonmoving party.'" *Gilmore v. Palestinian Interim Self-Gov't Auth.*, 53 F. Supp. 3d 191, 200 (D.D.C. 2014) (quoting *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006)), *aff'd*, 843 F.3d 958 (D.C. Cir. 2016).

The moving party bears the burden of showing that there is a lack of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The nonmoving party then must present "evidence showing that there is a triable issue as to [each] element essential to that party's claim." *Arrington v. United States*, 473 F.3d 329, 335 (D.C. Cir. 2006). A party's assertion that a fact is or is not disputed "must support the assertion by . . . citing to particular parts of . . . the record . . . ; or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The evidence presented must

---

[4] Defendants' renewed motion relies on the exhibits attached thereto, labeled Exhibits Q–X (ECF Nos. 32-1–32-8), and on the exhibits that were attached to their first motion for summary judgment, Exhibits A–P (ECF Nos. 10-1–10-10, 16-1–16-6). Confusingly, plaintiffs' opposition ignores defendants' labeling and refers to defendants' exhibits as Exhibits A–G instead of Q–X. The Court is using defendants' labeling system.

be admissible at trial or at least "capable of being converted into admissible evidence." *Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000); *see also* Fed. R. Civ. P. 56(c). To the extent the parties rely on affidavits or declarations, those documents also "must be made on personal knowledge." Fed. R. Civ. P. 56(c)(4).

In evaluating a motion for summary judgment, the Court views the admissible evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in its favor. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). It does not, however, make credibility determinations or weigh the evidence. *Id.* If the nonmoving party presents competent evidence upon which a reasonable jury could decide in its favor on each element of its claim, a court will deny summary judgment. *Gilmore*, 53 F. Supp. 3d at 201. But, if there is only "a scintilla of evidence in support of the plaintiff's position," or "[i]f the evidence is merely colorable, or is not significantly probative," a court may grant summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 252 (1986) (citations omitted). "The possibility that a jury might speculate in the plaintiff's favor . . . is simply insufficient to defeat summary judgment." *Athridge v. Aetna Cas. & Sur. Co.*, 604 F.3d 625, 631 (D.C. Cir. 2010) (citation and internal quotation marks omitted).

## II.  COUNT 1: THE FEDERAL WIRETAPPING STATUTE

Defendants argue that they are entitled to summary judgment on Count 1 because the evidence shows that no audio recording ever occurred, as required by the federal wiretapping statute,[5] or, in the alternative, no recording (audio or video) occurred on or after September 22,

---

[5] The federal wiretapping statute provides that "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter may in a civil action recover from the person or entity, other than the United States, which engaged in that violation such relief as may be appropriate." 18 U.S.C. § 2520. The Court previously

2015, and, thus, plaintiffs' claim is barred by the applicable two-year statute of limitations.[6] (*See* Defs.' Mot. at 7–16.)

Plaintiffs do not dispute the legal underpinnings of defendants' arguments—that audio recording is required and that recording must have taken place after September 22, 2015—but they claim these are disputed issues of fact that preclude the granting of summary judgment. Thus, the dispositive question for the Court is whether plaintiffs have presented evidence upon which a reasonable jury could conclude that defendants' surveillance (1) included audio or (2) that it took place on or after September 22, 2015.

### A. Audio

To support their contention that no audio recording ever took place (Defs.' Facts ¶¶ 11, 14, 16), defendants have submitted substantial evidence, including declarations and testimony from the Johnson Controls representatives involved in installing the cameras (*see* Defs.' Ex. K at 8:13–8:20, ECF No. 16-1; Johnston Decl. ¶¶ 6–7; Defs.' Ex. R ¶ 5, ECF No. 32-2 ("Bradford Decl.")), from both defendants (*see* Defs.' Ex. F at 24:7–24:9, ECF No. 10-6; Defs.' Ex. G at 14:5–14:8, ECF No. 10-7; Brown Decl. ¶¶ 4, 10, 14, 18), and from former Deputy Chief Cleveland Walls (*see* Defs.' Ex. I at 20:16–21:1, ECF No. 10-9). Plaintiffs "dispute that the audio connections were never completed, and that no audio recordings were ever made" (Pls.' Facts ¶ 14), but upon a close examination of the evidence cited by plaintiffs, there is inadequate evidentiary support to create a disputed issue of fact.

---

determined that silent video surveillance is not a "wire, oral, or electronic communication" as defined by the statute. *Allen*, 320 F. Supp. 3d at 39.

[6] Any civil claim brought pursuant to the statute "may not be commenced later than two years after the date upon which the claimant first has a reasonable opportunity to discover the violation." 18 U.S.C. § 2520(e).

7

First, while plaintiffs concede that the professionals from Johnson Controls did not program the cameras or the DVR to receive and record audio when they were installed, they claim—relying on the declaration of Gordon Johnston, the Johnson Controls representative who installed the cameras in the Control Room and the Report Writing Room—that Johnson Controls "instructed Defendant Brown how to operate and change the settings" and that Brown did change the settings. (Pls.' Facts ¶¶ 11, 14, 16.) However, all that Johnston actually attests to is that the cameras were installed without audio and, even if audio wires had been connected, the audio would not have been transmitted because the DVR was not programmed to receive audio. (Johnston Decl. ¶¶ 6–7.) Contrary to plaintiffs' assertion in paragraph 11, Johnston did *not* state that he showed Brown how to enable audio recording or that Brown enabled the audio recording. (*Id.*)

Similarly, plaintiffs' citation to the log kept by Brown of suspicious or prohibited activity observed through the recording devices is misplaced, as that document does not contain any evidence of audio recording. (*See generally* Defs.' Ex. W, ECF No. 32-7.) Instead, the log only describes activity that was *viewed*.

Plaintiffs also cite to their own declarations, in which many of them swear that the camera found in the Control Room was connected by a wire to a microphone, that "[t]he microphone had a red, LED light [that] was covered by . . . electrical tape," and that, once the tape was removed, they saw that the LED light was lit. (*See* Rego Decl. ¶¶ 4–7; *see also* Jeter Decl. ¶ 4; Holder Decl. ¶ 4; Pls.' Ex. 5 ¶¶ 4–7, ECF No. 35-6 ("Allen Decl."); Pls.' Ex. 6 ¶¶ 4–5, ECF No. 35-7 ("Soto Decl."); Pls.' Ex. 7 ¶¶ 4–6, ECF No. 35-8 ("Smallwood Decl."); Pls.' Ex. 8 ¶¶ 4–6, ECF No. 35-9 ("Starleper Decl."); Pls.' Ex. 9 ¶¶ 4–6, ECF No. 35-10 ("Singleton Decl.").) Several of these declarations attach photos of the LED light, taken when the camera

was discovered. (*See* Rego Decl. at 9, 11; Jeter Decl. at 8, 10; Allen Decl. at 8, 10.) But the LED light is labeled "MINI CCD CAMERA," and there is nothing in the record to support the inference that the lit LED light means that the microphone was functioning, as opposed to indicating that the camera was operating.[7] Absent any such evidence, their conclusion is nothing more than speculation, and "[t]he possibility that a jury might speculate in the plaintiff's favor . . . is simply insufficient to defeat summary judgment." *Athridge*, 604 F.3d at 631 (D.C. Cir. 2010) (citation and internal quotation marks omitted).

Plaintiffs also point to statements in their declarations describing incidents in which Brown "target[ed] officers who said things in the Control Room in private conversations." (Rego Decl. ¶ 13; *see also* Allen Decl. ¶¶ 15–17.) For example, Rego claims that thirty minutes after he called Brown "an incompetent jackass" to a coworker, he was called to Brown's office and "counseled . . . in an aggressive manner about things that occurred days before." (Rego Decl. ¶¶ 8–12.) And plaintiff Robert Allen claims that when the officers discovered the camera in the Control Room, Brown entered the room only *after* the microphone had been covered up. (Allen Decl. ¶¶ 15–17.) Plaintiffs argue that the timing of Brown's actions supports the inference that audio recording was taking place. However, neither incident is suggestive of an audio recording. As for the first incident, Brown did not mention the comment Rego made to his coworker, but referred to things that had happened "days before," and as to the second incident,

---

[7] Indeed, as defendants point out, their counsel purchased a mini CCD digital camera to test whether the LED light indicates that audio is being transmitted or recorded. He filed a declaration in the 2015 Litigation, to which defendants cite in this case (Defs.' Facts ¶ 14), in which he stated that the red LED light turns on when *only* the power supply is connected to the camera, without any audio or video connections. (Nebeker Decl., *Allen v. Brown*, No. 15-cv-0969 (D.D.C. February 8, 2016), ECF No. 25.)

9

since Brown could see what the officers were doing, there is no reason to infer that he heard anything.

Given the substantial evidence submitted by defendants, the absence of any direct evidence of audio recordings, and the lack of sufficient evidence to support the inferences that plaintiffs imagine, the Court concludes that a reasonable jury could not determine that audio was ever received or recorded by defendants' covert devices. Since silent video surveillance does not violate the federal wiretapping statute, defendants are entitled to summary judgment on Count 1.

### B. Statute of Limitations

Alternatively, defendants are entitled to summary judgment on Count 1 because it is barred by the applicable two-year statute of limitations, which requires that recordings took place on or after September 22, 2015. In their statement of undisputed facts, defendants claim that the camera in the Control Room ceased operating no later than the end of January 2014, that the camera in the Report Writing Room was operational only until March 23, 2014, and that there was never a camera in the Watch Commander's Office. (Defs.' Facts ¶¶ 6–7, 17.) Plaintiffs do not dispute that the Control Room camera ceased operating in January 2014, but they assert in their statement of disputed facts that the camera in the Report Writing Room was "in this room until August 2015" (Pls.' Facts ¶ 7), while claiming in their opposition brief that "Defendants engaged in continuing violations through at least March 2016." (Pls.' Opp. at 2.)[8] In response, defendants contend that plaintiffs have presented no competent evidence that any video recording took place after September 22, 2015. (Defs.' Mot at 15–16.) The Court agrees.

---

[8] Plaintiffs do not specifically allege the timeframe when the camera in the Watch Commander's Office was operational.

First, plaintiffs rely on former Deputy Chief Hubert Thompson's deposition testimony in which he recalled conversations he had with plaintiffs Steven Smallwood and Anthony Green.[9] But the conversations Thompson described took place in August 2015, so he could not have been told that cameras were operating on or after September 22, 2015. (*See* Thompson Dep. at 24:5–26:11.) In addition, any information conveyed by plaintiffs to Thompson is hearsay and, thus, not admissible on summary judgment.[10] *Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007) (hearsay "counts for nothing" on summary judgment (citation and internal quotation marks omitted)).

Plaintiffs also point to Thompson's testimony that he had seen video footage that "was from like March of 2016." (Thompson Dep. at 57:12–57:13.) But the footage that was being discussed came from a camera located in Thompson's own office, which is not a location at issue in this lawsuit. (*See id.* at 53:25–55:12; 57:10–58:11; 78:18–80:8.) And, the Court does not agree with plaintiffs' non sequitur that the existence of a camera in Thompson's office in March 2016 "clearly provides evidence that there were more hidden cameras located throughout the facility and that these cameras were still recording as late as March 2016." (Pls.' Opp. at 16.) Such a statement about a camera in Thompson's office tells us nothing about cameras in the locations that are at issue here.

Finally, plaintiffs cite to emails sent in June 2015 from Brown to Mark Bradford, a representative at Johnson Controls, in which Brown seeks "a confirmation that nothing is still connected or recording and the cameras have been removed." (Pls.' Ex. 16, at 2, ECF No.

---

[9] Hubert Thompson worked at the VA Medical Center from June 2015 to July 2016. (Thompson Dep. at 19:18–19:22.)

[10] Out-of-court statements by parties are admissible, but only if they are statements made by an *opposing* party. Plaintiffs cannot use their own statements to Thompson.

35-17.) But emails sent in June 2015 are not evidence that the camera in the Report Writing Room was operational on or after September 22, 2015. Moreover, Brown's emails do not show that the camera in the Report Writing Room was still operational in June 2015. If anything, they suggest that Brown believed that the cameras were no longer functioning then.

In sum, plaintiffs' evidence that recording took place after September 22, 2015, is insufficient to create a genuine dispute of fact. Thus, defendants are also entitled to summary judgment on Count 1 on the basis that it is barred by the applicable two-year statute of limitations.

### III. COUNT 4: FOURTH AMENDMENT *BIVENS* CLAIM AGAINST BROWN

Pursuant to *Bivens v. Six Unknown Agents*, 403 U.S. 388, 395 (1971), a federal official may be sued in his or her individual capacity for damages caused by actions that violate the Fourth Amendment. Defendants argue that they are entitled to summary judgment on plaintiffs' *Bivens* claim against Brown either because (1) it is barred by the applicable statute of limitations or (2) there was no Fourth Amendment violation.

#### A. Statute of Limitations

In the District of Columbia, *Bivens* claims are subject to a three-year statute of limitations. D.C. Code § 12–301(8); *see also Berman v. Crook*, 293 F. Supp. 3d 48, 56 (D.D.C. 2018) (citing *Banks v. Chesapeake and Potomac Telephone Co.*, 802 F.2d 1416, 1429 (D.C. Cir. 1986)). Accordingly, plaintiffs' claim is barred unless there is evidence that surveillance occurred after September 22, 2014.

With respect to the Report Writing Room, defendants concede that there is admissible evidence that a camera was in place there after September 22, 2014. (Defs.' Mot at 23.)[11]

---

[11] Curiously, in their statement of facts, defendants state as an undisputed fact that the camera in

Specifically, defendants cite Rego's declaration in which he stated that he "found the camera in [that room] on December 31, 2014." (Rego Decl. ¶ 18.) Rego's statement is arguably corroborated by an email sent on December 31, 2014, by Ibtesam Muhammad, a union representative, in which Muhammad stated:

> After entering the room 1E229H [the Report Writing Room] Officer Rego proceeded to show the Union where the camera was located. The camera was located above the main door on the left hand side close to the ceiling[.] [Y]ou can see the mini-hole where the camera was located.[12]

(*See, e.g.*, Pls.' Ex. 21, at 14–15, ECF No. 35-22.)[13] While the evidence is far from persuasive, it is sufficient to create a genuine dispute as to whether there was a camera in the Report Writing Room after September 22, 2014.

With respect to the other rooms, plaintiffs rely on evidence the Court has already addressed: Thompson's deposition testimony describing conversations he had with plaintiffs Smallwood and Green in August 2015; Thompson's deposition testimony about video surveillance from March 2016; and Brown's emails to Johnson Controls in June 2015. Although these dates appear to fall within the statute of limitations applicable to Count 2, the evidence is nonetheless insufficient to create a genuine dispute as to whether video recordings occurred in

---

the Report Writing Room "was operational until March 23, 2014." (Defs.' Facts ¶ 7.) But then in their motion, defendants concede the existence of admissible evidence of taping after the September 22, 2014 deadline. (Defs.' Mot. at 23.)

[12] It is unclear if this email is referring to seeing the camera or only the holes where the camera might have been. Given defendants' concession, this ambiguity need not be resolved.

[13] Plaintiff Marlon Holder's declaration states: "I know that the camera in the Police Report Writing Room was not removed until after July of 2015." (Holder Decl. ¶ 11.) But absent any indication that this statement is supported by personal knowledge, this evidence would not be admissible and cannot be used on summary judgment. *See* Fed. R. Evid. 602; Fed. R. Civ. P. 56(c)(4).

13

either the Control Room or the Watch Commander's Office on or after September 22, 2014. Specifically, Thompson's testimony describing conversations with Smallwood and Green is inadmissible hearsay,[14] his testimony regarding footage from a camera in his own office does not support an inference that there were contemporaneous recordings in any of the rooms at issue in this case; and Brown's emails do not provide evidence that recordings were occurring at any time after September 22, 2014.

Based on the undisputed evidence, no reasonable jury could conclude that surveillance took place in either the Control Room or the Watch Commander's Office on or after September 22, 2014.[15] Thus, plaintiffs' *Bivens* claim is barred by the statute of limitations except to the extent it challenges surveillance in the Report Writing Room.

---

[14] Moreover, there is nothing in these conversations, as reported by Thompson, that raises a dispute of fact that recording was still occurring when these conversations took place in August 2015, as opposed to prior to that date:

> Q: . . . [W]hat did Steven Smallwood tell you about his understanding of the cameras' installation, dates and anything else related to the three cameras reflected in Exhibit 2?
>
> A: As far as recalling dates, I mean, I couldn't recall the actual dates he may have stated. But he did state that there were cameras in the report writing area and the control room.
>
> . . .
>
> Q: What about Anthony Green[?] What did he tell you about cameras installed in the VA Medical Center in D.C.?
>
> A: It was basically the same conversation I had with Smallwood. They kept referring to the same locations.

(*See* Thompson Dep. at 24:5–26:11.)

[15] Indeed, as discussed *infra* Section II.B.i, no reasonable jury could conclude that there was any surveillance in the Watch Commander's Office.

14

## B. Fourth Amendment Violation

For plaintiffs' Fourth Amendment claim to survive, there must have been a search and a reasonable expectation of privacy in each of the areas searched. *McGregor v. Greer*, 748 F. Supp. 881, 887 (D.D.C. 1990); *see also Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986) ("The gravamen of a Fourth Amendment claim is that the complainant's legitimate expectation of privacy has been violated by an illegal search or seizure."). Defendants argue that plaintiffs' claim fails because (1) they cannot show that a search took place in the Watch Commander's Office and (2) they did not have a reasonable expectation of privacy in the Control Room and the Report Writing Room. The Court agrees.

### i. Watch Commander's Office

To support their contention that surveillance did take place in the Watch Commander's Office, plaintiffs point to (1) Thompson's deposition testimony describing conversations with Green and Elton Artis, former deputy chief and criminal investigator at the VA Medical Center; (2) Thompson's deposition testimony describing conversations with Brown; (3) Brown's deposition testimony referencing a "third camera;" and (4) Rego's declaration stating that he saw "holes" in the walls of the Watch Commander's Office. (Pls.' Facts ¶ 1, 17.) But none of this evidence creates a genuine dispute of fact about whether a camera was installed in the Watch Commander's Office.

First, although Thompson testified that both Green and Artis told him that there was a camera placed there (*see* Thompson Dep. at 26:6–26:16, 49:14–49:19), that testimony is hearsay and, as discussed above, not admissible on summary judgment. (*See supra* Section II.A.)[16]

---

[16] Even if Green's purported statement to Thompson were admissible, Thompson later admitted that Green did not tell him that he personally saw a camera in the Watch Commander's Office.

Second, Thompson's testimony regarding conversations with Brown about the cameras was as follows:

> Q: On how many occasions did you speak with Chief Brown about cameras being installed?
>
> A: That I can recall, maybe twice.
>
> Q: And what was stated during those conversations?
>
> A: Basically that there was some issues that were brought up about officers being asleep—sleeping on duty and doing other activities within those areas specified, in the control room, watch commander's office, and the report writing area.

(Thompson Dep. at 40:10–40:19.) Although one could perhaps argue that it would be plausible to infer from this testimony that Brown installed a camera in the Watch Commander's Office, Thompson never actually says that Brown told him that there was a camera in the Watch Commander's office. And, significantly, Thompson later testified that he "could . . . be wrong about [Brown] saying he had cameras in the watch commander's office," and that Brown instead could have been addressing the cameras he had been *accused* of having installed. (*Id.* at 69:15–69:20.) Moreover, Thompson, as previously discussed, says nothing about the dates during which a camera was purportedly in place there.

Plaintiffs also point out that Brown once referred to a "third camera" in his deposition testimony:

> Q: How long were the cameras installed?
>
> A: They went in, in 2013, November or December. I believe the *third camera* that was in the control room was discovered sometime in mid January, so that was—that one was just operational, I'm sorry.
>
> The one that was in the police report writing room, I believe it came down sometime in March. The contractor came out and—after we had put a call in to have the cameras taken down, he came out. And then the camera that was in the

---

(Thompson Dep. at 27:19–27:21.) Therefore, it is unclear whether Green had any firsthand knowledge that would qualify him to testify on this issue.

16

>report writing room had been disconnected and no longer functional. So I'm
>going to say around March 2014.

(Defs.' Ex. T at 27:11–28:2 (emphasis added), ECF No. 32-4 ("Brown Dep.").) Even when considered in the light most favorable to the plaintiffs, Brown's testimony, both in this excerpt and throughout his deposition, makes clear that there were only two cameras, neither of which were located in the Watch Commander's Office. Moreover, his response is consistent with the remainder of his testimony, in which he maintains that he had only two covert cameras installed in the VA Medical Center—one in the Control Room, and one in the Report Writing Room. (*See, e.g., id.* at 12:16–13:10.)[17] And when specifically asked whether a camera or any other "type of recording device" was installed in the Watch Commander's Office, or whether there was ever an effort to have one placed there, Brown answered, "[n]o" and "[n]ot to my knowledge." (*Id.* at 15:13–15:18; 40:10–40:12.) Thus, this testimony provides no support for plaintiffs' claim.

Finally, Rego states in his declaration that he "personally saw holes in the Watch Commander[']s Office similar to those in the Report Writing Room where the surveillance equipment was installed." (Rego Decl. ¶ 20.) But he goes on to state that "[n]o one was able to check to see if a camera was there." (*Id.* ¶ 21.) Thus, like all of the other evidence that plaintiffs rely on, Rego's declaration does not actually place a camera in the Watch Commander's Office.

To create a genuine dispute, the nonmoving party must present "more than a scintilla of evidence" in support of its position. *Anderson*, 477 U.S. at 252. Here, plaintiffs' evidence, when viewed in the light most favorable to plaintiffs, fails to meet that standard. As no reasonable jury

---

[17] This testimony was corroborated by the invoice from Johnson Controls, which bills the VA Medical Center for only two cameras (*see* Pls.' Ex. 17, at 3, ECF No. 35-18), and the declarations of the Johnson Controls employees who installed the two cameras. (*See* Johnston Decl. ¶¶ 2–5; Bradford Decl. ¶ 2–4.)

could conclude that a search occurred in the Watch Commander's Office, defendants are entitled to summary judgment on plaintiffs' Fourth Amendment claim both because there is no dispute of fact that there was covert surveillance in the Watch Commander's Office.

### ii. Control Room and Report Writing Room

Even assuming that surveillance occurred in the Control Room or the Report Writing Room on or after September 22, 2014, the Court must decide if plaintiffs had a reasonable expectation of privacy in these locations.[18] (Defs.' Mot. at 5.)

As defendants point out, neither room is "private;" rather, both rooms are communal spaces to which all VA officers have access. (*Id.*; Defs.' Facts ¶ 20.) Plaintiffs counter that neither room is "open to the public" and that, while in them, plaintiffs "could stop talking when other individuals entered the rooms," "doors could be closed to prevent individuals from outside the office from overhearing conversations," and plaintiffs could "vent and criticize their employers."[19] (Pls.' Opp. at 7, 22; Pls.' Facts ¶ 20.) But plaintiffs have not provided, and the Court has not found, any support for the assertion that employees have a reasonable expectation of privacy in an area simply because it is not open to the public and could be used for private conversation with colleagues. To the contrary, each of the cases cited by plaintiffs in which a court found that the plaintiff-employees had a reasonable expectation of privacy in a workspace involved either "an office reserved for one's exclusive use at a place of employment," *United*

---

[18] The parties dispute whether the standard governing work-related searches set forth in *O'Connor v. Ortega*, 480 U.S. 709 (1987), applies. However, regardless of whether it does, the plaintiffs must show that they had a reasonable expectation of privacy in the area searched. Because they have not done so, the Court does not need to decide what standard applies.

[19] Most of plaintiffs' argument that they had a reasonable expectation of privacy is tied to their claim that at least one officer used the Watch Commander's Office to change her clothes. (*See* Pls.' Opp. at 21–23.) Since the Court has concluded that there was no search in that location, whether they had a reasonable expectation of privacy in that room is immaterial.

*States v. Taketa*, 923 F.2d 665, 673 (9th Cir. 1991), or a room used as a locker room. *See Bernhard v. City of Ontario*, 270 F. App'x 518, 519 (9th Cir. 2008) (plaintiff-employees had a reasonable expectation of privacy in a locker room); *Jones v. Houston Cmty. Coll.*, 816 F. Supp. 2d 418, 434 (S.D. Tex. 2011) ("It is objectively reasonable to expect privacy in an office when it is routinely used as a locker room."); *Avila v. Valentin-Maldonado*, No. 06-1285, 2008 WL 747076, at *12–13 (D.P.R. Mar. 2008) (plaintiff-employees had a reasonable expectation of privacy in a "locker-break room" used by some employees to change clothes); *Doe v. Dearborn Pub. Schs.*, No. 06-cv-12369-DT, 2008 WL 896066, at *5 (E.D. Mich. Mar. 31, 2008) (plaintiff-employees had a reasonable expectation of privacy in a "locker room/office" where they "could change their clothes"). The Control Room and the Report Writing Room are not those types of rooms. Moreover, plaintiffs' privacy in their conversations in these rooms is not infringed upon by silent video surveillance. Thus, the Court concludes as a matter of law that plaintiffs had no reasonable expectation of privacy in either room. Without such an expectation, there can be no Fourth Amendment violation.

In sum, defendants are entitled to summary judgment on Count 4 because no reasonable jury could conclude that a search occurred in the Watch Commander's Office, and there is no legal basis upon which to find that plaintiffs had a reasonable expectation of privacy in the Control Room or the Report Writing Room.

## CONCLUSION

For the foregoing reasons, the Court will grant defendants' motion for summary

19

judgment. A separate Order accompanies this Memorandum Opinion.


ELLEN S. HUVELLE
United States District Judge

Date: January 24, 2020